# Exhibit "19"

the same, the conviction documents would be available at the same time. As noted in the correspondence from SRI Brehm to me, SRI Brehm makes a point of asking me why my case has been outstanding for six weeks. Yet, as evidenced in a handwritten note from SRI Kojima to Kelly Brehm and the subsequent response by Kelly Brehm to SRI Kojima, this case could not be handed in until such time as the conviction documents were obtained from the U.S. District Court (My Exhibit BJ). As evidenced by this handwritten note, it is obvious that there is a double standard being applied to me when there is a like work product being completed by another Senior Inspector. In this case, Kelly Brehm is applying two different standards of conduct by employees under his supervision when a similar/like product is being produced.

54. Case number three concerned a criminal alien who was refused entry two days earlier, on January 26, 1998. It was totally unreasonable for Kelly Brehm to demand that this file be completed by January 28, 1998

55. All these cases were well within the guidelines that other Senior Inspector take in completing their cases. There is no time sensitivity to those reports. The deadlines Kelly Brehm set were completely arbitrary.

56. Kelly Brehm continues to put undue pressure on me, pressure that he does not put on non-Latino Seniors. This issue happened two days after issue # 5 above and it was in the same context. This shows a continuing pattern of adverse actions and disparity in treatment. It was done with the same individual and with the same effect-causing a racially hostile work environment and a continuing pattern of harassment at my work location against me. No other Senior Immigration Inspector is put under this type of unnecessary pressure. I also feel that Kelly Brehm put this pressure on me in order to discourage me from wanting to work for him as a Senior Inspector and in the hopes that I would go back to Los Angeles.

57. The last paragraph of the written assignment Kelly Brehm gave to me on January 28, 1998 instructs me not to talk to other Senior Immigration Inspectors regarding work. I can only interpret this instruction as an attempt to isolate me. No one else is asked not to share information with his coworkers. Such an instruction limits my resources. As is the case with all of the other issues in my complaint, I believe that this instruction is a form of harassment, based on national origin discrimination and an attempt by Kelly Brehm to exclude me from his Senior unit.

ISSUE 8    3/5/98 – COMPLAINANT'S WRITING STYLE WAS CRITICIZED

Q:    Who criticized your writing? What was the criticism? Was it valid?


EXHIBIT "19"

Is it not management's responsibility to monitor the quality of the written work produced? Does management criticize other people's work? Whose? How were you adversely affected?

58. March 5, 1998 was the first time I wrote a Memorandum that was reviewed by Kelly Brehm. A copy of that memo (Memorandum to File A76 342 715, dated March 2, 1998) is provided for this report. It shows the changes Kelly Brehm made to my narrative. Also, as will be addressed in issue # 11, Kelly Brehm made extensive changes to an affidavit I wrote. This affidavit was written on May 1, 1998 and its structure and content were based on my experience writing affidavits gained as a Special Agent in Los Angeles.

59. Kelly Brehm criticized the memo and has continued to criticize virtually every narrative I have since produced from a stylistic point of view. Kelly Brehm stifles my self expression, linguistic characteristics, and preference for words. Individual expression is one of the most fundamental elements that make human beings unique as individuals. I feel that this is an example of Kelly Brehm abusing his position by controlling one of the fundamental venues that define me as an individual-speech and expression. Further, I feel that this is done by Kelly Brehm in an attempt to exert his power and dominance over me and demonstrate my inadequacy as a member of a minority group.

60. The Immigration Service is not a venue for playing academia with service employees. I was a higher level Manager than Kelly Brehm and there is no document/directive/policy or procedure which directs Service Managers to impose their own preference for words and structure of sentence on their employees' work product. Further, this would be an undue burden on any Manager to master the English language to such a degree that he/she would be required, as a condition of employment, to correct other degreed Service employees. Checking for typographical errors is common and it's normal for employees to give their work product to other employees for a re-read to catch these errors. This was not the case. This was a simple Memo to clarify an issue of identity and the words I used were adequate for the readers of this Memo-other Service employees.

61. Kelly Brehm likes to look at everything that goes out of the office. I don't know whether he criticizes other people's work.

62. The past correspondence that I wrote as a Special Agent (Criminal Investigator) and GS-13 Supervisor were adequate for 1) the Service, 2) the U.S. District Courts and 3) outside agencies. This is evident by the fact that I received outstanding on all my PWP ratings. There was more writing involved in the work I did in Los Angeles than in my current position. Yet, my writing has never before been criticized. Kelly Brehm is the only supervisor that felt a need to correct my work in this area.

63. I believe that Kelly Brehm was again finding fault as a means of harassing me because of my national origin. Further, I sought EEO Counseling on March 2, 1998. It is possible that Kelly Brehm decided to increase his harassment at that point in retaliation for my having sought EEO counseling.

ISSUE 9:     3/17/98 – ASSIGNED TO SECONDARY FOR 3RD DAY

Q:     What is the difference between primary and secondary? Why is primary preferable to secondary? Were others available to work secondary? What were the reasons, if any, given for the assignment? Has anyone else, to your knowledge, been assigned to secondary for three consecutive days? Have you been assigned to secondary for three consecutive days on more than one occasion?

64. Primary refers to the first contact that a representative of Immigration has on an arriving passenger. They can either make a decision to admit the passenger or send the passenger back to secondary. Secondary, as used in Senior unit terminology, is the place that an Alien is sent who is not readily admissible and who could be a possible Senior interest case opposed to an Alien who would be handled administratively by a non-Senior inspector.

65. Primary is not part of a Senior's job duties. Immigration Inspectors, GS-9 and below, work primary. Their duties are processing passengers as they get off the plane. A Senior only works on primary if there is a shortage of manpower such as when a lot of flights come in at the same time and there is a backlog. They call in all available manpower at the port. At this time, the amount of time a Senior would work on primary is 2-3 hours.

66. Eighty to ninety percent of a Senior Immigration Inspector's work originates from his assignment to Secondary. He is responsible for finishing all the cases that arise while he is assigned to Secondary.

67. Normally, a Senior Immigration Inspector at the Honolulu International Airport is assigned to Secondary once a week and sometimes twice through the normal rotation. Except for me, all of the Senior Immigration Inspectors stay on a normal rotation. I am the only Senior to be assigned to work secondary on three days in one workweek. If you're assigned Secondary a lot, you will be carrying the majority of the work load in the Senior unit.

68. March 17, 1998 was the only time that Kelly Brehm assigned me to work Secondary for three consecutive days, March 19–21. There was no reason for the assignment other than harassment. Any other Senior Immigration Inspector could have been assigned to one or two of the days I was asked to work Secondary.

